WILHELM RADKE *vs.* WINONA & ST. PETER RAILROAD COMPANY.

October 9, 1888.

Public Lands—Grant to Railroad of Right of Way.—The grant of the right of way over sections 16 and 36 (school sections, so called) of the public domain, acquired by the appellant's predecessor, the Transit Railroad Company, under the congressional act of March 3, 1857, and the act of the territorial legislature, passed May 22, 1857, was not a grant *in præsenti*, but *in futuro.*

Same—Grant, when Available.—Such grant must be used under the statutes referred to, if at all, before the lands are sold or disposed of by the state.

Plaintiff brought this action in the district court for Brown county, to recover possession of a strip of land 100 feet in width across section 16, township 110, in that county, occupied and used by defendant for its railway, together with damages for the withholding of

possession by defendant. The defendant, which has succeeded to the rights, etc., of the Transit Railroad Co., pleaded the statutes mentioned in the opinion. At the trial, before *Webber,* J., it appeared that the quarter-section was sold by the state and certificates issued to plaintiff's grantors on October 19, 1868, on which a patent issued to plaintiff April 30, 1886; and that the defendant in April, 1872, took possession of the strip and built its railroad thereon. Plaintiff had a verdict, a new trial was refused, and the defendant appealed.

*Wilson & Bowers,* for appellant.

*Lind & Hagberg,* for respondent.

COLLINS, J. In the case of *Simonson* v. *Thompson,* 25 Minn. 450, this court declared that the act of congress of March 3, 1857, commonly known as the "Land-Grant Act," granted a right of way for railroad purposes over and across the even-numbered sections of land, in addition to an absolute grant of each odd-numbered section, (within certain limits,) although there was no express grant of such right of way. It must be presumed, said the court, from the general purposes of the act, that it was the intention of congress to vest whatever might be necessary to speed the construction of the railways, and not permit the mere fact that the title to some of the lands over which the roads should be built might be in the general government to delay the building until further action of congress could be had. The further reasoning of the court relative to the effect of Laws 1857, (Ex. Sess.) *c.* 1, *subc.* 1, § 3, is pertinent here, because, with the exception of a few words at the end of the section, relative to notice of the rights of the company, said section is precisely like section 4, chapter 27, Laws 1855, (the charter of the Transit Railroad Company,) under which this defendant in part asserts its right to occupy the strip of land in controversy. It must be observed, however, in this connection, that in the *Simonson Case* the plaintiff made his homestead entry after the railroad had been built.

The next case which bears upon the one at bar is *Coleman* v. *St. Paul, M. & M. Ry. Co.,* 38 Minn. 260, (36 N. W. Rep. 638,) in which the principal question was whether, by virtue of the federal act and a railroad charter substantially like that of the Transit Company,

(chapter 27, *supra*,) the predecessor of that defendant acquired a right of way through a school section upon which its road had been built long before the sale thereof by the state. The reasoning in *Simonson* v. *Thompson* was applied, the conclusion being that a grant of a right of way over the public domain necessarily extended to and over school lands, as well as other even-numbered sections.

We therefore find a question, which was elaborately argued in the briefs submitted upon the appeal, foreclosed by the decision in *Coleman* v. *St. Paul, M. & M. Ry. Co.*, *supra*. This brings us to a determination of the inquiry finally made prominent in that decision, and we think the conclusion is very clearly indicated in each of the cases cited above. The question is, has a private right attached to the strip of land in dispute, which will bar the claim of the defendant railway company, and compel it to proceed by condemnation to acquire its right of way? The right which the predecessor of this appellant, the old Transit Company, had, came through the land-grant act of 1857, or the territorial legislation before mentioned, or both. To its privileges the appellant has succeeded. It insists that from each of these sources it has a grant *in præsenti*, a float, which acquired precision when the route of the railroad was definitely located, relating back to the date of the grant, and thus becoming superior to, and taking precedence of, the rights of all intervening purchasers; that the title of the road to its right of way accrues as of the date of the statute. In the case of *Winona & St. Peter R. Co.* v. *Randall*, 29 Minn. 283, (13 N. W. Rep. 127,) this court held, following the universal current of federal decisions, that a grant of lands to this defendant corporation in aid of the construction of its railway was a present grant; that when precision was acquired by the location of the line of road, and the lands indicated to the authorities by proper certificate, such act of indication and certification related back to the date of the original grant. Therefore the title of the state and of the beneficiary company was of that date.

The effort is now made to apply the doctrine thus advanced as appropriate to lands granted absolutely to a mere right of possession and user for railroad purposes, which, so far as congressional action is concerned, was given by implication only. It is manifest that such

a result should not be permitted, unless the congressional or legislative intent is apparent in the federal or territorial acts before mentioned. The court of last resort in the United States had occasion, in *Railway Co.* v. *Alling*, 99 U. S. 463, to construe a federal statute wherein had been granted to a railway company organized under the laws of the then territory of Colorado a right of way, in express words, over the public domain along its lines. The charter of the company designated and described, in a general way, the main line and its several branches, all so connected as to constitute a complete and extended railway system for that entire region. The act must be construed, the court remarks, as if it had contained a full or detailed description of the routes of the different lines. Bearing that in view, the language of the act and the circumstances and conditions of the company when it was passed, which need not be repeated here, the court was of the opinion—the chief justice dissenting—that a present beneficial easement was conferred in the particular way over which the designated routes lay. When the location of the different lines of road was made, and the way actually appropriated, the imperfect title acquired precision, and, by relation, took effect as of the date of the grant. Only a glance is necessary to discover the difference between the statute involved in that case and the federal one relied upon by this appellant. In the one case, congress, the court presumed, knew that certain steps had been taken by the corporation towards building its roads. It was informed so fully of the routes over which the roads were to be constructed that the statute was construed precisely as if detailed descriptions of the proposed lines had been embodied in the statute itself. Other circumstances and conditions were considered, as well as the important fact that there was, in words, an absolute and explicit grant of a right of way, with a limit as to the time within which the roads were to be built.

In the act of 1857 the routes along which were granted absolutely the odd-numbered sections of land were described in a very general way only. There was no attempt to prescribe the lines with exactness or certainty; right of way was not mentioned at all; the roads had not been located; some subsequently benefited by the grant had not then been chartered; there was no period of time fixed within

which the roads should be built; and there were no conditions or circumstances, of which congress was advised, from which can be gathered an intent upon its part to fasten upon the even-numbered sections of land along the several indefinite and unascertained lines of proposed railway, and for all time, the easement demanded by the appellant.

The question again presented itself in *Railroad Co.* v. *Baldwin,* 103 U. S. 426. The opinion is by Mr. Justice Field, the chief justice dissenting, without expressing his views. By the act of congress therein involved lands had been granted the state of Kansas in aid of the construction of a certain railway already chartered, and named and described in the act itself. There was also given, in exact and ample phraseology, a right of way over public lands. The majority of the court were of the opinion that the grant of right of way was *in præsenti;* that there were no conditions, except such as might be implied; and that the words of the act, "there is hereby granted," imported an immediate transfer of interest, which, when the road was located, attached from the date of the act. Much importance is given to the words of the statute quoted above in the opinion, and they are italicized and made prominent in a statement of the case prepared by the justice who spoke for the court.

It therefore seems plain that neither of these federal decisions are in point here, nor of much value as authority upon the material question before mentioned. While it is settled that by implication congress intended to grant a right of way to the proposed railroads over the government lands, it does not follow that this right was to be held in abeyance until such time as the roads might be built, and then, by relation, take effect as of the date of the grant. We are clearly of the opinion that the intention could only have been to confer the right over such public lands as were not disposed of when the roads were actually located. The perpetual incumbrance of the even-numbered sections along lines so indefinitely described as those mentioned in the act, with a float of this magnitude, could not have been contemplated by those who voted for the measure, without an explicit expression of their intention. It would not have been left for us to infer that so injurious and burdensome an easement, which, as time

rolled on, could be extended and enlarged according to the needs (real or fancied) of the corporation, had a present existence, and at some future time, depending upon the construction of the railroad, might become a real and substantial injury to those who might buy or otherwise acquire the land from the government.

Turning now to a consideration of the territorial legislation, especially section 4, chapter 27, Laws 1855, we assert that much which has been said relative to a plain expression of the congressional intent to create *in præsenti* an easement upon the public lands is applicable to this branch of the discussion. As before stated, the section is like that commented upon in the *Simonson Case*, and it seems to us that a careful examination of it and other sections of the act strengthens the belief that, had the legislature intended to make the grant of a right of way *in præsenti*, instead of *in futuro*, it would have plainly said so, and left nothing for inference or controversy. Section 4 first provides that the Transit Railroad Company shall have a right of way upon, and may appropriate for its own use and control, for railroad purposes, a strip of land throughout its entire length. It further authorizes an entry upon, possession and use of, any lands, etc., for the purposes of survey and location of the railway, with its appendages and appurtenances. So far there is nothing to indicate that any of these privileges become substantial before proceedings by the company through a survey and location, or that they accrued in any manner before actual appropriation of a right of way. The language used confers a right, to be exercised only at such time as the company may see fit to enter upon an actual survey, location, and construction of the road. It is simply a right to enter upon and use in the future; not a present nor immediate appropriation. The next paragraph of the same section is as follows: "All such lands * * * which may now belong to this territory or hereafter be acquired thereby, or by the state, * * * is [are] hereby granted to the said corporation, * * * to be by them [it] held and possessed so long as the same shall be used for such purposes, and no longer: *provided* that, in case any of the lands which have been reserved, or shall be hereafter reserved or granted, for the use of schools, shall be included within the limits of the said line, the said corporation

shall pay therefor such sum, not less than one dollar and twenty-five cents per acre, as the legislature of the territory or such other state shall fix, which sum shall be paid to the governor thereof, and shall belong to the school fund of said territory or state." The lands here mentioned are evidently such as have been appropriated for right of way purposes by actual entry upon and possession thereof in the ordinary construction of the road. The corporation can exercise this privilege only from the time it commences to use the lands for its chartered purposes, and until it ceases so to use. This view is strengthened and fortified by the proviso. School lands, included in the limits of the lines of road, must be paid for in a manner specifically designated. As the legislature had in mind the trust character of these lands, and also that railroads would have to cross them, it expressly pointed out the method of settling for the right. It is obvious from this that it was not intended that a present interest in school sections should be transferred. Without clear and unambiguous language, it ought not to be held that the territorial legislature intended to do more than to authorize and license the appellant's predecessor to enter upon, appropriate, and use for its corporate purposes a right of way over and across lands which might be unsold, which were in fact school lands, whenever it had occasion to locate and establish its lines of railway, at the time it actually entered upon the construction of its road. The legislature could not have intended, when incorporating this provision for payment to the governor at a price per acre to be named by it, so absurd a result as would be reached if, after the school lands had been sold, paid for by, and conveyed to, private parties, the state could again realize from the railways for such part of the same tracts as might be used for right of way. Nor, taking another view of it, did it anticipate the infliction of a burden which would either keep the lands wholly out of the market or retard their sale, and compel the state to reserve in its conveyances an easement so indefinite in area and uncertain as to location across lands over which said roads might subsequently be built.

There is no evidence in the case which will sustain the appellant's claim that the land in question was taken or appropriated

by and with the consent and acquiescence of the plaintiff. For that reason the charge of the trial court upon this branch of the case was correct.

As the plaintiff's rights to the land antedate those claimed by the appellant, and no just criticism can be made of the charge as to the measure of damages, the order denying a new trial is affirmed.

NOTE. On Nov. 7, 1888, a reargument was ordered of these questions: "1. Is the grant of right of way made by the act of congress of March 3, 1857, *in præsenti* or *in futuro?* 2. Is the grant of right of way made by the Transit Company charter (passed by the territorial legislature May 22, 1857), *in præsenti* or *in futuro?*"